### MURRAY v. SHIPMAN KOAL CO.

(Circuit Court of Appeals, Third Circuit. February 14, 1921.)

No. 2565.

1. **Corporations ⬅426(10)—Liable on unauthorized notes of which it received the proceeds.**

A corporation cannot receive and retain the benefit of the proceeds of notes executed in its name, and repudiate the notes, even though they were executed without authority.

2. **Corporations ⬅414(5)—Notes executed by treasurer without authority not valid obligations of corporation.**

Where the treasurer of a coal company contracted for the purchase of all of its stock, and pursuant to the contract took over the management of its business on behalf of himself and his associates in the purchase, but owing to default in payment the contract was not carried out, notes given by him in the name of the company, without authority of the directions for money advanced by one of his associates, which was not used in the business of the company, but was paid for stock under the contract, *held* not to be valid obligations of the corporation.

In Error to the District Court of the United States for the Middle District of Pennsylvania; Charles B. Witmer, Judge.

Action at law by Edward F. Murray against the Shipman Koal Company. Judgment for defendant, and plaintiff brings error. Affirmed.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James Farrell, of Troy, N. Y., for plaintiff in error.

Layton M. Schoch, of Philadelphia, Pa., and Henry W. Chamberlin, of Milton, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is a suit instituted by the plaintiff in error to recover from defendant $14,250 and interest alleged to be due on two promissory notes made by him to the order of defendant and delivered to Abel I. Culver. On May 9, 1914, John B. Corliss, who owned or controlled all of the capital stock of the defendant company, and Abel I. Culver, treasurer of the company, entered into a contract whereby Corliss agreed to sell to Culver the entire capital stock of the defendant company, consisting of $300,000 common stock, all issued and outstanding, and $300,000 preferred stock, of which $132,000 was issued and outstanding, for $350,000. Corliss was on that day to deposit with the Columbia Knickerbocker Trust Company of New York City certificates representing all the shares of the common stock, and on or before May 29, 1914, certificates representing all the outstanding preferred stock, provided Culver paid, in cash, $20,000 on the date of agreement, $30,000 on or before May 22, 1914, and $25,000 on or before May 29, 1914. Corliss was to bring about the election of Culver and two others to be nominated by him as directors of the defendant company, and to file in escrow with the said Trust Company the resignations of the other two directors and all of the officers of the defendant company. Resignations of Culver and his nominees, elected to the board of directors, were to be similarly filed. Culver was further to pay $150,000 on or before January 1, 1915, and $125,000 on or before May 1, 1915, aggregating the full purchase price, with interest thereon, at 6 per cent. per annum, payable semiannually. All these payments, except the first, were to be deposited in the said Trust Company, and paid out on checks signed by Corliss and countersigned by Culver as treasurer.

This was a special escrow deposit in the name of the company, and was to be used in part for acquisition of preferred stock in pursuance of the agreement. When the final payment was thus made, the Trust Company was to deliver to Culver all the certificates of stock, resignations, and other papers held in escrow. The books of the company were to be closed on May 15, 1914, and Corliss was to assume and pay all the liabilities of the company on the date the books were closed; and during the existence of the contract, until the final payments were made, Culver agreed not to allow any mortgage or lien to be placed upon the property, or any other obligation to be created against it, except in the usual course of operation. Corliss and Culver further agreed that they would co-operate in causing, and use their best efforts to apply, the amounts of the payments to be made by Culver, as heretofore set forth:

"(1) To the prompt payment and discharge of all the liabilities of said Company accrued and unpaid on the date of closing the books as aforesaid.

"(2) To the purchase of the thirteen hundred and twenty-nine (1,329) shares of outstanding preferred capital stock of the company at par and accrued dividends to the date of payment.

"(3) The balance, if any, of said payments to be paid to said Corliss or order on May 1, 1915, provided said Corliss shall have produced valid vouchers showing the payment of all the liabilities of the company which he agreed to pay hereunder."

The contract contained the further provision that Culver—

"will subscribe, or cause to be subscribed and paid for, or cause to be paid for, in cash such an amount of preferred stock as is necessary to provide working capital for said company, not in excess of two hundred and fifty (250) shares of the preferred capital stock of said company, said cash to be paid into the treasury of the company and to be expended in the discretion of said Culver for the purchase of new equipment or otherwise."

Under the contract, and during its existence, until the terms thereof were complied with, Corliss was to retain the office of president and director of the company, and Culver was to be treasurer and general manager, and was "to have the active management of the business affairs and current operations of the company." Culver became the treasurer and general manager of the company, and operated the mines, but was unable to make the payments in accordance with the contract, and so on January 19, 1916, finally defaulted, and surrendered the management and property of the corporation to Corliss.

On January 4, 1915, the plaintiff made his check, payable to the order of the defendant company, and delivered the same to Culver, who made, in the name of the defendant and delivered to plaintiff, a note for $5,000. This note was subsequently renewed, and reduced to $4,250. On June 12, 1915, Culver, in the name of defendant, made and delivered to plaintiff a note for $10,000 as security for two checks for $5,000 each, payable to order of defendant, one of which was made on June 11, 1915, and the other on June 14, 1915, by plaintiff, and delivered by him to Culver. It is for the amount of these three notes and interest that suit is brought.

Defendant filed an affidavit of defense, alleging that the notes were given without proper authority; that Culver had no authority to execute notes in the name of the company for personal loans to himself; that the money was not used for corporate purposes, and that Murray was interested with Culver as partner or copurchaser of the stock of said company, in pursuance of which the money was loaned or advanced to Culver by him.

Upon the pleadings and proofs, the learned trial judge, sitting by agreement of the parties without a jury, found that the proceeds of the checks for which the notes were given "were used by Culver in an attempt of putting over the deal, and without any benefit derived by the defendant company," and that Culver was the agent of and represented Murray in the transaction. Consequently the company was not liable, and judgment was entered for defendant.

[1] The evidence does not disclose any action by the directors authorizing Culver to execute the notes in question. Regardless of this, however, if the defendant company received the plaintiff's money, and it was used for corporate purposes, as plaintiff contends, as a general proposition of law, defendant cannot avoid payment. The company may not retain the benefit of the transaction and repudiate the burden

thereof, even though the notes were executed without authority. Presbyterian Board v. Gilbee, 212 Pa. 310, 61 Atl. 925; First National Bank of Bangor v. Am. Bangor Slate Co., 229 Pa. 27, 77 Atl. 1100; Hartzell v. Abbvale Mining Co., 239 Pa. 602, 86 Atl. 641.

[2] The law is clear, but the case turns at this point upon a question of fact. Did the defendant company, as constituted before or after the Culver management, receive the benefit of the proceeds of these checks? The check for $5,000, of January 4, 1915, was deposited in the so-called "escrow" account in the Knickerbocker Trust Company. The other two checks, for $5,000 each, on June 11, 1915, and June 14, 1915, were deposited in the Dime Trust & Safe Deposit Company at Shamokin, Pa. This account was subject to the check of Culver alone. The $10,000 deposited in this account was immediately transferred to the "escrow" account in the Knickerbocker Trust Company, and the entire $15,000, so deposited, was paid out in acquiring preferred capital stock in pursuance of the agreement between Corliss and Culver. It was thus merely "washed through" the company's account in the Dime Trust & Safe Deposit Company without benefit to the defendant company.

On the contrary, Corliss testified that the obligations of the company aggregated about $70,000 when the books were closed on May 15, 1914, which amount under the terms of the contract he assumed and paid, but that, when Culver surrendered the mines and management of the company, its obligations had increased to $125,000, a loss of about $55,000 in operating the mines, besides the loss of $150,000 on 300,000 tons of coal, worth 50 cents a ton, which had been removed from the mines during the Culver operation.

Did Culver, as agent or otherwise, represent Murray in negotiating the contract with Corliss, and in the operation of the mines and management of the defendant company generally? The testimony shows that Murray embarked on this enterprise with Culver. It is clear that, in negotiating the contract, Culver did not himself expect to finance the proposition, either in paying for the stock or operating the mines. There were undisclosed persons whom he represented. One of these was Murray. This is admitted both by Culver and Murray. Manifestly, Culver was not operating the mines for the interest of the old stockholders and officers of the company, who were in office at the time the contract was executed, and whose resignations were filed in escrow with the Knickerbocker Trust Company. He was operating this company for those whom he represented in purchasing it. Murray testified that Culver made the terms and conditions of the contract, and he was willing to go in on it with him, and back him to the extent of one-eighth.

In depositing the check of January 4, 1915, for $5,000, from Murray, in the Knickerbocker Trust Company, and in transferring to that company the $10,000 represented by the other two checks from the Dime Trust & Safe Deposit Company, immediately after it was deposited, with which preferred stock was subsequently purchased, Culver was carrying out the terms of the contract for himself and associates, including Murray. While, as a fact, the company existed as a

legal entity, yet it had turned its property over to a proposed new company; that is, a new set of men, who had the management of the property, and who were to become the owners of it and operate it under the old name. It was not the old men back of the company who received and used the money in question, but the set represented by Culver. Since he failed to carry out the terms of the contract, and surrendered the property, decreased by about $205,000, it would be both illegal and inequitable to hold the company liable for Murray's money spent by Culver in carrying out the failing enterprise on which Murray had embarked.

The contract executed between Corliss and Culver was properly admitted by the learned trial judge, and the judgment will be affirmed.